Argued and submitted July 2, reversed and remanded August 29, 2012

Scott McCOLLUM
and Janice McCollum,
*Petitioners-Appellants,*

*v.*

STATE OF OREGON,
acting by and through the
DEPARTMENT OF LAND CONSERVATION
AND DEVELOPMENT,
*Respondent-Respondent.*

Jackson County Circuit Court
105361Z9; A149325

286 P3d 916

Barbee B. Lyon argued the cause for appellants. With him on the briefs were David J. Petersen and Tonkon Torp LLP.

Denise G. Fjordbeck, Attorney-in-Charge, Civil/Administrative Appeals, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Ballot Measure 49 (2007) sets out standards and processes to obtain homesite approvals for claimants who sought or obtained land use regulation waivers under Ballot Measure 37 (2004).[1] Senate Bill (SB) 1049 (2010) modified those standards for a class of claimants that included petitioners. Petitioners sought two homesite approvals under Measure 49 as amended by SB 1049. The Department of Land Conservation and Development (DLCD) denied the claim, and a reviewing court affirmed that denial. On appeal, we conclude that petitioners are entitled to one additional homesite approval under section 6 of Measure 49 and, therefore, reverse and remand.

It is necessary to describe the statutory context before framing the legal issues that arise from DLCD's order and the parties' contentions. As noted, this case concerns whether DLCD properly calculated the number of homesite approvals allowed to petitioners by Measure 49. Measure 49 limits the extent and type of development that can be allowed to a Measure 37 waiver claimant, replacing a right to obtain the full extent of the uses permitted at the time the owner acquired the property—the compensation allowed under Measure 37—with a limited number of homesite approvals.[2] As explained by the Supreme Court:

> "Among other things, Measure 49 retroactively extinguished previously issued Measure 37 waivers of land use regulations. *See Corey v. DLCD*, 344 Or 457, 466-67, 184 P3d 1109 (2008) ('Measure 49 by its terms deprives Measure 37 waivers—and *all* orders disposing of Measure 37 claims—of any continuing viability'; emphasis in original). As a result, landowners who had begun developing their property under authorization granted by Measure 37 waivers could no longer automatically continue to do so. Instead, those landowners had to choose one of three alternative 'pathways' moving forward: an 'express pathway,' a 'conditional pathway,' and 'a third pathway

---

[1] Measure 37 required public entities that adopted or applied restrictive land use regulations to either pay monetary compensation to the property owner or waive the application of those regulations. *Former* ORS 197.352 (2005), *amended by* Or Laws 2007, ch 424, § 4, *renumbered as* ORS 195.305 (2007).

[2] For purposes of Measure 49, "'[h]ome site approval' means approval of the subdivision or partition of property or approval of the establishment of a dwelling on property." ORS 195.300(12).

for claimants that have vested rights to carry out claims that have already been approved.' Tape Recording, Joint Special Committee on Land Use Fairness, SB 1019, Apr 19, 2007, Tape 43, Side A (statement of Richard Whitman, Oregon Department of Justice, summarizing the proposed 'framework' for amending Measure 37); *see* Or Laws 2007, ch 424, § 5 (setting out those three alternatives).

"The express pathway entitles a landowner to obtain development approval for up to three additional homes on his or her property. *See* Or Laws 2007, ch 424, § 5(1) (identifying express pathway). Under the conditional pathway, a landowner can obtain approval for four to 10 homes if, among other conditions, the land use regulations prohibiting the construction of those homes resulted in a specified reduction of the fair market value of the property. *See id.* §§ 7 and 9 (setting out conditional pathway and describing conditions). Finally, the vested rights pathway permits a landowner who had obtained a Measure 37 waiver to 'complete and continue the use described in the waiver,' provided that the landowner could also demonstrate a 'common law vested right' to complete that use. *Id.* § 5(3)."

*Friends of Yamhill County v. Board of Commissioners*, 351 Or 219, 224-25, 264 P3d 1265 (2011); *see also Hoekstre v. DLCD*, 249 Or App 626, 278 P3d 123 (2012) (similarly quoting *Friends of Yamhill County* and describing the relationship between Measures 37 and 49); *Ericsson v. DLCD*, 251 Or App 610, 285 P3d 722 (2012) (also discussing Measures 37 and 49).

Petitioners' claim arose under section 6, the "express pathway," which provides that a qualifying Measure 37 claimant is "eligible for [up to] three home site approvals on the property if the requirements of this section and sections 8 and 11 * * * are met." Measure 49 § 6(1). To qualify for homesite approvals under section 6, a property owner is required to prove a timely claim under Measure 37 and satisfaction of the substantive criteria of section 6(6), including a showing that, "[o]n the claimant's acquisition date, the claimant lawfully was permitted to establish at least the number of lots, parcels or dwellings on the property that are authorized under this section." *Id.* at § 6(6)(f).[3]

---

[3] Section 6(6) provides:

The actual number of lots or dwellings that can be allowed under section 6 is limited by sections 6(2) and 6(3) of Measure 49. Section 6(2) provides, in part:

> "The number of lots, parcels or dwellings that may be approved for property under this section may not exceed the lesser of:

> "(a)   The number of lots, parcels or dwellings described in a waiver issued by the state before December 6, 2007 ***; or

> "(b)   Three, except that if there are existing dwellings on the property or the property contains more than one lot or parcel, the number of lots, parcels or dwellings that may be established is reduced so that the combined number of lots, parcels or dwellings, including existing lots, parcels or dwellings located on or contained within the property, does not exceed three."

Those limitations are partly ameliorated by section 6(3), which provides, in part:

> "Notwithstanding subsection (2) of this section, a claimant that otherwise qualifies for relief under this section may establish at least one additional lot, parcel or dwelling on the property."

The first legal issue in this case concerns the meaning of "otherwise qualifies for relief under this section" as that term is used in section 6(3).

---

"To qualify for a home site approval under this section, the claimant must have filed a claim for the property with both the state and the county in which the property is located. In addition, regardless of whether a waiver was issued by the state or the county before December 6, 2007, to qualify for a home site approval under this section the claimant must establish that:

"(a) The claimant is an owner of the property;

"(b) All owners of the property have consented in writing to the claim;

"(c) The property is located entirely outside any urban growth boundary and entirely outside the boundaries of any city;

"(d) One or more land use regulations prohibit establishing the lot, parcel or dwelling;

"(e) The establishment of the lot, parcel or dwelling is not prohibited by a land use regulation described in ORS 195.305(3); and

"(f) On the claimant's acquisition date, the claimant lawfully was permitted to establish at least the number of lots, parcels or dwellings on the property that are authorized under this section."

The second legal issue involves SB 1049 and the interplay of that law with sections 6(2) and 6(6). SB 1049 adjusted the standards in Measure 49 to correct certain problems that arose in its initial implementation by DLCD. One of those problems concerned the uncertain application of section 6(6)(f), the homesite approval standard limiting development to that which a claimant "lawfully was permitted to establish" on the acquisition date. During the period between the adoption of the statewide planning goals (January 25, 1975) and acknowledgement of a comprehensive plan implementing those goals, the statewide planning goals directly applied to applications for land use permits. *Alexanderson v. Polk County Commissioners*, 289 Or 427, 434, 616 P2d 459 (1980) (goals directly apply to a "land conservation and development action" involving "specific tract[] of land" prior to plan acknowledgement). However, as explained by DLCD in the order under review in this case, there was "uncertainty * * * regarding the factual and legal requirements for establishing compliance with the statewide planning goals" after the adoption of the goals, particularly for development on farm land and forestlands. For that reason, section 2 of SB 1049 set out more objective criteria for determining the number of allowed homesites under section 6(6)(f) for properties acquired during that period.

Sections 2(1) and 2(2) of SB 1049 state those policies. Section 2 of SB 1049 provides that, for purposes of section 6(6)(f), if property was acquired after the adoption of the goals but before plan acknowledgement,

"the claimant is deemed to have been lawfully permitted to establish one or more home sites, as follows:

"(1)  For property that was subsequently designated in the first acknowledged comprehensive plan as land subject to a goal related to agricultural lands or a goal related to forestlands and that was not zoned, was subject to a zone without a fixed minimum acreage standard or was subject to a zone with a fixed minimum acreage standard that would have allowed at least the number of home sites that would result under the application of this subsection:

"(a)  If the property contains less than 20 acres, the claimant is deemed to have been lawfully permitted to establish one home site on the property.

"(b) If the property contains at least 20 acres and less than 40 acres, the claimant is deemed to have been lawfully permitted to establish up to two home sites on the property.

"(c) If the property contains 40 acres or more, the claimant is deemed to have been lawfully permitted to establish up to three home sites on the property.

"(2) For property that was subsequently designated in the first acknowledged comprehensive plan as land subject to a goal related to agricultural lands or a goal related to forestlands and that was subject to a zone with a fixed minimum acreage standard that would not have allowed at least the number of home sites that would result under the application of subsection (1) of this section, the claimant is deemed to have been lawfully permitted to establish up to three home sites on the property, consistent with the fixed minimum acreage standard in the zone on the date the claimant acquired the property."

Or Laws 2010, ch 8, §§ 2(1), 2(2) (Spec Sess). The SB 1049 statutory interpretation issue in this case concerns whether the phrase "zone with a fixed minimum acreage standard" and related provisions in sections 2(1) and 2(2) refer to the zoning in place when the property was acquired or to the zoning that was applied immediately prior to acknowledgement of the comprehensive plan.[4]

Both legal issues arise in the following context. We take the facts from DLCD's order. Petitioner Scott McCollum acquired a 15.63-acre parcel in rural Jackson County on December 29, 1976.[5] At that time, the property was improved with a dwelling and was zoned Farm

---

[4] Cities and counties are required to adopt comprehensive plans and zoning to implement those plans. *See* ORS 197.175(2)(a), (b) (requiring localities to adopt comprehensive plans in compliance with the statewide planning goals, and then to "[e]nact land use regulations to implement their comprehensive plans"). Once a plan and implementing zoning is adopted, the plan and land use regulations are submitted to the Land Conservation and Development Commission (LCDC) for acknowledgement—that is, a certification that the plan and zoning complies with the goals. *See* ORS 197.251 (setting out acknowledgement processes). Adoption of the zoning to implement the comprehensive plan necessarily predates acknowledgement of the plan by LCDC.

[5] Petitioner Janice McCollum acquired her interest in the property later. Under section 21 of Measure 49, "[i]f there is more than one claimant for the same property under the same claim and the claimants have different acquisition dates, the acquisition date is the earliest of those dates."

Residential (F-5) and Open Space Development (OSD-5) by the county. Those zoning districts had a five-acre minimum acreage standard for lots. The applicable comprehensive plan was acknowledged on May 16, 1983. The plan provided for the application of exclusive farm use (EFU) zoning to the property. The implementing EFU zoning required 80 irrigated acres or 160 nonirrigated acres for the creation of a new lot and establishment of a new dwelling on the regulated land.

Petitioners sought and obtained a Measure 37 waiver of the EFU zoning from Jackson County and requested a Measure 37 waiver from DLCD for post-acquisition restrictions under state law. Following the adoption of Measure 49, petitioners applied for homesite approvals under section 6, as amended by SB 1049. DLCD concluded in its final evaluation order that, "because the claimants' property consists of less than 20 acres and is already developed with a dwelling, under SB 1049 the claimants are not entitled to any additional development of the Measure 37 claim property." DLCD implicitly concluded that petitioners were entitled to one homesite approval under section 2(1) of SB 1049, that section 6(2) of Measure 49 offset that entitlement with the existing dwelling, and that section 6(3) did not apply because petitioners did not "otherwise qualif[y] for relief under this section."

Petitioners petitioned the circuit court for review of that order.[6] Petitioners claimed that DLCD improperly interpreted SB 1049 by applying section 2(1) to their claim, instead of section 2(2), and that, under section 2(2), they were "lawfully permitted to establish up to three home sites on the property," including the existing dwelling. DLCD reiterated that petitioners were entitled to one homesite under section 2(1), that allowance was taken away by section 6(2) of Measure 49, and that no additional homesite

---

[6] ORS 195.318(1) provides that judicial review of a DLCD final order under Measure 49 is "under ORS 183.484," a statute that pertains to circuit court review of a state agency order that does not result from a contested case proceeding. ORS 195.318(3) further provides that the review is limited to the administrative record and to issues raised before the public entity issuing the Measure 49 order. *See Ericsson,* 251 Or App at 628-29 (Measure 49 evidentiary issue not justiciable because of failure to raise the issue during the DLCD proceedings).

was allowable under section 6(3). Petitioners replied that, even if only one homesite was allowed by section 2(1) and offset by section 6(2) of Measure 49, an additional homesite was still allowable under section 6(3). The reviewing court affirmed DLCD's order, and petitioners appealed the resulting judgment.

On appeal, we assess the circuit court judgment to determine whether the court correctly exercised its review function under ORS 183.484. Under ORS 183.484(5)(a), if the reviewing court finds that the agency "erroneously interpreted a provision of law and that a correct interpretation compels a particular action," it shall "set aside or modify the order" or remand it "to the agency for further action under a correct interpretation of the provision of law." To evaluate the judgment under review, we necessarily must revisit DLCD's interpretations of Measure 49 and SB 1049 to determine if those interpretations are correct. *See G.A.S.P. v. Environmental Quality Commission,* 198 Or App 182, 187, 108 P3d 95, *rev den,* 339 Or 230 (2005) ("In practical effect, *** we directly review the agency's order for compliance with the standards set out in ORS 183.484(5).").

On appeal, petitioners renew the contentions that they raised below. They first argue that DLCD improperly construed section 2 of SB 1049 in determining that petitioners were only allowed one homesite approval under section 2(1), rather than three homesite approvals under section 2(2). As noted, sections 2(1) and 2(2) begin with a common textual premise; both apply to "property that was subsequently designated in the first acknowledged comprehensive plan as land subject to a goal related to agricultural lands or a goal related to forestlands." At that point, the paths differ. As noted, section 2(1) allocates homesites on the basis of acreage if the property

> "was not zoned, was subject to a zone without a fixed minimum acreage standard or was subject to a zone with a fixed minimum acreage standard that would have allowed at least the number of home sites that would result under the application of this subsection [*i.e.,* one, two, or three dwellings depending upon the acreage of the property]."

By contrast, section 2(2) allocates "up to three home sites on the property, consistent with the fixed minimum acreage

standard in the zone on the date the claimant acquired the property," if the property

"was subject to a zone with a fixed minimum acreage standard that would not have allowed at least the number of home sites that would result under the application of subsection (1) of this section[, *i.e.*, one, two, or three dwellings depending upon the acreage of the property]."

Petitioners reason that the referenced "zone with a fixed minimum acreage standard" in both subsections is the zoning that implements the comprehensive plan and predates its acknowledgement in 1983. They argue that the use of different words to describe a zoning provision in section 2(2), "zone with a fixed minimum acreage standard" and "fixed minimum acreage standard in the zone on the date the claimant acquired the property," implies a reference to two different zoning provisions, and the only relevant zoning district apart from the acquisition zoning is the zoning that more specifically restricted residential use of the property—the fixed minimum acreage zoning imposed by the acknowledged comprehensive plan.

Petitioners explain that, if the zoning referenced in section 2(2) refers in both instances to the acquisition zoning, the provision never could result in the approval of three homesites, a result inconsistent with the express allowance in section 2(2) of "up to three" homesite approvals. They reason that, if the relevant zoning (the "zone with a fixed minimum acreage standard") is the acquisition zoning, then section 2(2) only operates when that zoning allows one or two, but not three, homesites (less than the "number of home sites that would result under the application of subsection (1) of this section"). Section 2(2) then limits the development to that one or two homesites ("consistent with the fixed minimum acreage standard in the zone on the date the claimant acquired the property"). That necessary result of only one or two homesite approvals, petitioners argue, is inconsistent with the statute's permission to establish "up to three home sites." To give effect to all of the words of the statute, petitioners conclude that the first "zone with a fixed minimum acreage standard" must mean something different.[7]

---

[7] By way of example, if the acquisition zoning is used for all purposes under sections 2(1) and 2(2) and a 50-acre tract is zoned at the time of purchase to

*See* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to *** omit what has been inserted[.]").

Instead, petitioners argue, if the "zone with a fixed minimum acreage standard" is the zoning imposed by the comprehensive plan, then all parts of section 2(2) can be given effect, including the three homesite allowance. Under petitioners' interpretation of the statute, their property was subject to the 80-acre minimum lot size EFU zoning ("a zone with a fixed minimum acreage standard") that did not allow the one homesite permitted by section 2(1), so that petitioners would be entitled to the three homesites that were consistent with the five-acre minimum lot size acquisition zoning.

We determine the meaning of the statute from the text, context, and useful legislative history of the provision. *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). Petitioners' construction of "zone with a fixed minimum acreage standard" is inconsistent with all three measures of legislative intent. As a matter of textual analysis, both sections 2(1) and 2(2) contrast a zoning regime to a "subsequent[]" comprehensive plan designation. The referenced zoning, then, is one that was applied prior to adoption and acknowledgement of the plan. Both sections use a common term to describe part or all of that predicate zoning—a "zone with a fixed minimum acreage standard." "When the legislature uses the identical phrase in related statutory provisions that were enacted as part of the same law, we interpret the phrase to have the same meaning in both sections." *Tharp v. PSRB*, 338 Or 413, 422, 110 P3d 103 (2005). Therefore, the predicate "zone with a fixed minimum acreage standard" is the same zoning for purposes of sections 2(1) and 2(2), and is either the acquisition zoning or some other preacknowledgement zoning.

allow houses on 10-acre lots, and the property was later downzoned by the plan to require 50 acres to site a dwelling, section 2(1) would permit three dwellings since the property is 40 acres or more and the acquisition zoning allowed at least three dwellings. If the acquisition zoning for that same property allowed houses on 25-acre lots, so that it "would not have allowed at least the number of home sites that would result" under section 2(1), *i.e.*, three homesites, and section 2(2) applied, the claimant would be entitled to two homesite approvals, since that would be "consistent with the fixed minimum acreage standard in the zone on the date the claimant acquired the property."

Tellingly, however, that same zoning regime in section 2(1) includes conditions where the property was "not zoned" or "was subject to a zone without a fixed minimum acreage standard." Those conditions necessarily describe the acquisition zoning rather than the later, more restrictive zoning imposed by the plan and the goals. A property could never be "not zoned" contemporaneously with the plan adoption. Counties are required to adopt zoning to implement a comprehensive plan. *See* ORS 215.050(2) (requiring counties to design zoning ordinances to implement a comprehensive plan); ORS 197.175(2)(b) (mandating counties to "[e]nact land use regulations to implement their comprehensive plans"). Thus, the zoning referred to in section 2(1), including the "zone with a fixed minimum acreage standard," and, by parallel construction, the same zoning in section 2(2) was likely intended by the legislature to be the acquisition zoning.

Moreover, the construction advanced by petitioners would leave a significant regulatory gap in the application of sections 2(1) and 2(2). One factual scenario could be that a 40-acre Measure 49 property is without minimum lot size limitations at the time of acquisition, but then those controls are imposed by the comprehensive plan zoning, and the new zoning would not allow any dwellings on lots less than 80 acres in size. Those facts would have qualified the property for a county Measure 37 waiver of the new zoning. In that case, if the predicate zoning is the new comprehensive plan zoning as suggested by petitioners, then section 2(1) would not apply because the property is zoned with a minimum lot standard that would not allow the three homesite approvals otherwise permitted by section 2(1)(c).

But no remedy would be available under section 2(2) either. The comprehensive plan zoning would not have allowed the three dwellings, but there would be no "fixed minimum acreage standard in the zone on the date the claimant acquired the property" from which to measure consistency and to determine the "up to three" number of allowable homesite approvals. We assume that the legislature intended to regulate all Measure 49 claims fitting within the prerequisites of section 2. Petitioners' construction of the provision is inconsistent with that legislative intent.

Finally, the legislative history of SB 1049 supports the construction of the law that is advanced by DLCD. Senator Floyd Prozanski sponsored the bill in the Senate and chaired the committee that conducted the only hearings on the measure. The staff to that committee summarized the final version of the bill:

> "SB 1049A also provides a process for approximately 700 properties that were acquired after the statewide land use goals were enacted in 1975 but before a county's comprehensive plan was acknowledged by DLCD. The claims in this 'pre-acknowledgement' category must comply with the local zoning at the date of acquisition, even if more restrictive. However, the claimants will no longer have to prove compliance with the statewide land use goals. Absent a more restrictive zoning, claimants will be allowed one home site if they own up to 20 acres, two home sites if they own 20 to 40 acres of land and three home sites if they own more than 40 acres of land."

Staff Measure Summary, Senate Committee on Judiciary, SB 1049 A, Feb 8, 2010.

That history suggests that the legislature intended to substitute an allowance of one, two, or three homesites in place of the homesite allowance that would otherwise result from the application of the statewide planning goals to a development request. Thus, section 2 of SB 1049 allocates up to three homesite approvals based on the acreage of the affected property, the imputed effect of the application of the goals, unless a greater restriction is required by the acquisition zoning. It does not, as petitioners suggest, allocate approvals without regard to the size of the property and any imputed effect of the goals, based only on the acquisition zoning. DLCD did not err in its application of section 2(1) to petitioners' homesite approval application.

That brings us to petitioners' second contention—that DLCD erred in its application of section 6(3) of Measure 49 to their request for homesite approvals. To recall, section 6(2) establishes a cap on homesite approvals that qualify by application of section 6(6). That limit is "the lesser" of (1) the number of lots or dwellings described in the state Measure 37 waiver or the Measure 37 claim or (2) three, for unimproved and undivided property. For improved

or divided property, the allowance is reduced "so that the combined number of lots, parcels or dwellings, including existing lots, parcels or dwellings located on or contained within the property, does not exceed three." Measure 49 § 6(2)(b). Section 6(3) then provides that,

> "[n]otwithstanding subsection (2) of this section, a claimant that otherwise qualifies for relief under this section may establish at least one additional lot, parcel or dwelling on the property."

We recently construed the meaning of section 6(3) in *Hoekstre*. In that case, a Measure 49 claimant had divided the property into three lots. He had one existing dwelling. 249 Or App at 631. The claimant contended that section 6(3) allowed an additional lot. *Id.* at 632. We concluded that a claimant is entitled to relief under section 6(3) only if no homesite approval—either an additional lot or dwelling or both—could be obtained under section 6(2) and that section 6(3) could not be used to increase the number of lots or dwellings to four or more. *Id.* at 637. The *Hoekstre* claimant would be entitled to homesite approvals to construct two new dwellings on the property. *Id.* at 638 n 7. And the effect of an additional lot and dwelling approval would be to authorize four dwellings and homesite approvals for the property.[8] Because relief was available under section 6(2), and because the effect of an additional homesite approval would be to exceed the three homesite eligibility limit in section 6(1),[9] no further relief was available under section 6(3). *Id.* at 637.

We concluded in *Hoekstre* that any homesite approval under section 6(3) was alternative, but not cumulative, to the approvals allowed by section 6(2), adopting DLCD's view that, "if a claimant is not entitled to relief under section 6(2), then 'notwithstanding [section 6(2)],' a claimant who 'otherwise qualifies for relief under

---

[8] As noted earlier, "'[h]ome site approval' means approval of the subdivision or partition of property or approval of the establishment of a dwelling on property." ORS 195.300(12). Thus, a homesite approval can be an approval of a dwelling on an existing lot or the approval of a new lot and associated dwelling.

[9] Section 6(1) provides that a Measure 49 claimant is "eligible for three home site approvals on the property if the requirements of this section and * * * [s]ections 8 and 11 of chapter 424, Oregon Laws 2007, are met."

[section 6] may establish at least one additional lot, parcel or dwelling on the property.'" 249 Or App at 637 (brackets in original).

Thus, the application of section 6(3) requires a claimant to show that the claimant "qualifies for relief under [section 6]" and that the relief is not otherwise available under section 6(2). Section 6(6) lists the requirements "[t]o qualify for a home site approval under [section 6]." Again, section 6(6)(f) requires proof that, "[o]n the claimant's acquisition date, the claimant lawfully was permitted to establish at least the number of lots, parcels or dwellings on the property that are authorized under this section." In *Ericsson*, we construed the meaning of "lawfully was permitted" for purposes of the application of section 6(6)(f):

> "[I]n light of the text and context of section 6(6)(f), together with the adoption record of the provision, we conclude that, in order to prove that a claimant 'lawfully was permitted' to establish dwellings or lots under section 6(6)(f), a claimant must prove by evidence in the DLCD administrative record that it is more likely than not that the claimant would have been actually permitted to establish the use *based on the application of prior law*, *i.e.*, the local and state land use regulations in effect at the time of acquisition, *to the condition of the property as it existed when the prior law was in effect.*"

251 Or App at 625-26 (emphasis added). Thus, in the regular application of section 6(6)(f), if the property was improved or divided on the acquisition date, a claimant would be permitted to establish only the additional level of development allowed by the acquisition zoning.

Under the substituted standard of section 2 of SB 1049, a different result obtains. As set out earlier, section 2 of SB 1049 states that, "[f]or purposes of section 6(6)(f), *** if a claimant acquired property [post-goals and preacknowledgement], the claimant is *deemed to have been lawfully permitted to establish* one or more home sites, as follows ***." (Emphasis added.) Thus, section 2 of SB 1049 replaces the calculation obtained under section 6(6)(f) for what was "lawfully *** permitted to [be] establish[ed]," a determination based on the conditions of the property at

the time of its purchase, with an allowance of a set number of homesites that "the claimant is deemed to have been lawfully permitted to establish," a determination that is not dependent upon site conditions. Under that standard, then, section 6(6) unconditionally "deem[s]" or determines petitioners' right to the homesite approval allowed by section 2(1) of SB 1049, notwithstanding the dwelling improvement at the time the property was acquired.[10] Petitioners, therefore, "qualif[y] for relief" under section 6(6).

Having concluded that petitioners qualify for relief under section 6(6), the next logical question is whether section 6(2) limits or abrogates that relief. The parties have not analyzed that issue. Both parties assume that section 6(2)(b) works to offset any homesite allowance under section 6(6) with one or more existing dwellings or lots.[11] Thus, they frame the inquiry as whether section 6(3) allows the development right in this case that section 6(2) takes away. We are reluctant to determine the meaning of section 6(2)(b) and its relationship to section 6(3) in the absence of briefing and argument by the parties. If section 6(2)(b) does not offset petitioners' single homesite allowance under section 6(6), then DLCD erred in not granting that allowance. If, on the other hand, petitioners' homesite allowance is offset by section 6(2)(b), and we assume that to be the case for purposes of this opinion, the question becomes whether the alternative relief allowed by section 6(3) applies.

Section 6(3) allows "at least one additional lot, parcel or dwelling" when a claimant "otherwise qualifies for relief under [section 6]." Petitioners' claim fits that bill. The

---

[10] "Deem" in this context means to "classify after some reflection." *Webster's Third New Int'l Dictionary* 589 (unabridged ed 2002).

[11] That assumption is subject to debate. As we held in *Hoekstre*, the homesite allowance under section 6(3) applies only if homesite approval relief under section 6(2) is not available. Applying section 6(2) to the facts in this case, the "number of lots, parcels or dwellings that may be approved [under section 6, *i.e.*, under section 6(6)(f) as modified by SB 1049]" is one. That number does not exceed the limitation of three homesites under section 6(2)(b). The offset clause of section 6(2)(b) may not apply because there are not "existing dwellings" on the property, that is, there is only one dwelling, and the property does not contain "more than one lot or parcel." If the offset clause does not apply, petitioners' homesite approval is not limited by section 6(2)(b), and there is no room for the application of section 6(3). We assume that the parties construe the term "existing dwellings" in section 6(2)(b) to mean one or more dwellings and express no opinion on the correctness of that assumption.

claim qualified under section 6(6)(f) as modified by section 2 and SB 1049. DLCD erred in failing to grant petitioners the one homesite approval for which they qualified, and the reviewing court erred in not directing DLCD to provide that relief.

Reversed and remanded.